# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                                          CRIMINAL ACTION NO. 3:17-00150-01

GERALD ROBINSON, JR.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Gerald Robinson Jr.'s "Motion to Suppress All Evidence Obtained During Vehicle Stop and Search." *Mot. to Suppress*, ECF No. 21. Defendant filed his Motion to Suppress on May 28, 2019, and the Government filed its Response on June 4, 2019. *Mot. to Suppress; Resp. to Mot. to Suppress*, ECF No. 26. On June 10, 2019, the Court held a hearing on Defendant's Motion. *See Hr'g Tr.*, ECF No. 30. Corporal Kevin Williams and Sergeant L.J. Deskins, two of the West Virginia State Police officers responsible for the contested stop and search, testified at the hearing. Consistent with the reasoning herein, the Court **DENIES** Defendant's motion.

## I. BACKGROUND

On April 13, 2017, several officers with the West Virginia State Police were conducting routine surveillance at the Huntington, West Virginia Greyhound Bus Station. *Id.* at 3. The police were aware that individuals carrying illegal drugs frequently come into Huntington on the bus from larger cities, such as Detroit, known to be the source of drugs into the area. *Id.* at 56. Observing from unmarked vehicles, Sergeant L.J. Deskins and other officers observed a bus from Detroit arrive at 6:00 a.m. and saw two male passengers walk to a silver Mazda bearing Kentucky plates that was waiting in the parking lot. *Id.* at 58–59. The officers were aware that the bus had

completed a stop in Ashland, Kentucky before arriving in Huntington, and were curious why a car registered in Kentucky would travel to West Virginia to pick up its passengers. *Id.* at 20, 22.

The officers, including Sergeant Deskins, decided to follow the vehicle and radioed Corporal Kevin Williams and his K-9, Feera, for assistance. *Id.* at 4, 59. At the time, Corporal Williams and Feera were stationed in an unmarked police cruiser in a business park near an entrance to Interstate 64. *Id.* at 4. Corporal Williams used his cruiser's computer to check the registration on the Mazda before he even began to follow it and discovered that the vehicle was licensed in Kentucky to an owner in Ashland. *Id.* at 30, 32. The suspect vehicle proceeded from downtown at the bus station through a residential area toward the interstate access ramp on Hal Greer Boulevard. *Id.* at 4. Corporal Williams' cruiser began following the Mazda just before it turned to the right on the west-bound entrance ramp. *Id.* As he was immediately behind the Mazda, Corporal Williams observed that its rear-window brake light failed to illuminate when the other brake lights came on as the vehicle made its turn. *Id.* at 5. Though he saw the broken light, he did not immediately stop the Mazda, waiting to do so until it had merged into interstate traffic and traveled some distance. *Id.* He testified that he waited until there was more space on the berm and he had reached a stretch of highway where his cruiser and the stopped Mazda were more readily seen by other traffic. *Id.* As Corporal Williams recalled it, there were two or three other unmarked police vehicles following him that also pulled over behind the stopped car. *Id.* at 6. According to dispatch records, the stop occurred at 6:07 a.m. *Id.* at 8.

Corporal Williams exited his vehicle and approached the passenger side of the Mazda as Sergeant Deskins, from one of the other police vehicles, approached the driver's side. *Id.* at 51, 61. The officers observed a driver, a front seat passenger, and a male who was lying in the back seat. *Id.* at 61. Sergeant Deskins asked for the driver's identification, registration, and insurance

certificate. *Id.* He also told the driver that the Mazda was pulled over due to a defective brake light. *Id.* Sergeant Deskins testified that the driver, identified as Charles Cordle, produced his license and Defendant's license, saying Defendant had left it with him on a prior occasion. *Id.* at 63. The passengers were also asked to identify themselves and where they were going. *Id.* at 62–64. The rear passenger, later identified as Tevin Robinson, produced his Michigan driver's license and told Corporal Williams they were going to visit a cousin. *Id.* at 9, 41. Defendant Gerald Robinson—Tevin's brother—was seated in the front passenger seat. *Id.* at 71. Sergeant Deskins asked the occupants why they were in a Kentucky vehicle, and in particular why they had been picked up in Huntington only to drive back to Kentucky, but received "no good explanation for it." *Id.* at 64. Increasingly suspicious, Sergeant Deskins directed the occupants to exit the vehicle because he considered this lack of explanation to be a potential sign of drug-related travel. *Id.* at 65. The officers spread the occupants out along the guardrail on the edge of the interstate, out of earshot of each other. *Id.* at 65–66.

At the guardrail, Sergeant Deskins questioned each occupant individually. *Id.* at 67–68. Tevin, the rear-seat passenger, claimed they were going to visit a cousin, James, in Marcum Terrace. *Id.* at 68. Defendant likewise indicated that they were on their way to visit a cousin named James, but that he lived in Guyandotte. *Id.* In light of this discrepancy and the fact that the Mazda had been heading toward Kentucky—away from both locations the Robinsons had provided—Sergeant Deskins asked Corporal Williams to deploy Feera to check for narcotics. *Id.* at 68. Near the middle of the driver's side where the doors meet, the dog alerted and indicated that she had detected narcotics. *Id.* at 47. In total, the dog search took no more than two to three minutes. *Id.* at 18.

After placing the dog back in the cruiser at 6:18 a.m., the officers searched inside the Mazda and found a black backpack on the rear floor and a red one on the front passenger floor. *Id.* at 13,18. An inspection of the bags revealed cocoa butter bottles containing oxycodone and Xanax. *Id.* at 13–15. The Robinsons were subsequently arrested. *Id.* at 15. Cordle, the driver, was permitted to leave the scene without receiving a citation. *Id.* at 36. Once the occupants provided what the officers characterized to be conflicting explanations of their intended destination, the defective brake light was largely forgotten.

## II. LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996). It is thus firmly established that "[a]n automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008).

As "a traffic stop is more akin to an investigative detention than a custodial arrest, [the Court must] analyze the constitutionality of such a stop under the two-prong standard enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Wiliams*, 808 F.3d 238, 245 (4th Cir. 2015). Importantly, "the lawfulness of a *Terry* stop turns not on the officer's actual state of mind at the time the challenged action was taken, but rather on an objective assessment of the officer's actions." *Branch*, 537 F.3d at 337 (internal quotations and citations omitted). Indeed, well-settled

precedent "forecloses[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren*, 517 U.S. at 813.

Pursuant to this objective standard, the Court must first determine "whether the officer's reason for the traffic stop was legitimate." *Id.* (citing *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992)). This first inquiry is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019). Notably, "[i]f a police officer observes a traffic violation"—no matter how minor or apparently pretextual—"he is justified in stopping [a] vehicle." *Branch*, 537 F.3d at 337.

If an initial stop is legitimate, the Court turns to the second prong of the *Terry* test and will "examine whether the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop." *Id.* (internal quotation marks omitted). This prong "is satisfied when the seizure is limited to the length of time reasonably necessary to issue the driver a citation and determine that the driver is entitled to operate his vehicle." *Bernard*, 927 F.3d at 805. "Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015). Tasks incident to a traffic infraction include "inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017). Moreover, officers may request the identifications of any passengers in a stopped vehicle in order to "gain [their] bearings and . . . acquire a fair understanding of the surrounding scene." *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007). Officers may also order a vehicle's

driver and passengers to step out of the car pending completion of the stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1997); *Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997).

During an otherwise lawful traffic stop, "[a]n officer . . . may conduct certain unrelated checks" that do not stem directly from the traffic infraction in question. *Rodriguez*, 135 S. Ct. at 1615. Such unrelated checks may include dog sniffs. *See id.* at 1615 (distinguishing dog sniffs from routine traffic safety measures). While an officer may perform certain unrelated checks during the course of a routine traffic stop, "he may not do so in a way that prolongs the stop." *Id.* Even a *de minimis* extension of a stop violates the Fourth Amendment. *Hill*, 852 F.3d at 381. Put more succinctly: once a "driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver must be allowed to proceed on his way." *Branch*, 537 F.3d at 336.

There are only two exceptions to this bright-line rule: where "the driver gives consent or [where] there is reasonable suspicion that an illegal activity is occurring." *Bernard*, 927 F.3d at 805. Reasonable suspicion "is a commonsense, nontechnical standard that relies on the judgment of experienced law enforcement officers, not legal technicians." *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (citing *Ornelas v. United States*, 517 U.S. 690, 695 (1996)) (internal quotations omitted). Although "reasonable suspicion is something more than an inchoate and unparticularized suspicion or hunch," *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000), "the quantum of proof necessary to demonstrate reasonable suspicion is considerably less than [a] preponderance of the evidence," *Branch,* 537 F.3d at 336 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

"[I]t is the government's burden to articulate facts sufficient to support reasonable suspicion." *Burton*, 228 F.3d at 258. "The presence or absence of reasonable suspicion must be

determined in light of the totality of the circumstances confronting a police officer[,] including all information available to an officer and any reasonable inferences to be drawn." *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989). A natural consequence of this framing is that "courts must look [to] whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (internal quotations omitted).

### III. DISCUSSION

With these principles in mind, the Court will begin by considering whether the challenged traffic stop was legitimate. Next, the Court will discuss whether the stop lasted longer than was necessary given its purpose and, if so, whether the Government has demonstrated that the officers possessed a reasonable suspicion of criminal activity when they extended the stop.

#### A. Legitimacy of Traffic Stop

Defendant makes much of the Government's reliance on the defective brake light to justify the stop of the vehicle. As a preliminary matter, the Court agrees that the officers were determined to stop the vehicle because they were suspicious of the occupants, and that the defective brake light merely provided a pretext to execute such a stop. Nonetheless, the officers' *subjective* intent is not controlling when considering the constitutional reasonableness of a traffic stop. *Whren*, 517 U.S. at 813. Rather, this Court must assess whether the officers had an objective basis to proceed that comports with the Fourth Amendment.

It is illegal in West Virginia to operate a motor vehicle with a disabled brake light. *See* W. Va. Code § 17C–15–18(b). Though Defendant can point to several circumstances that fail to corroborate the defective light, the Court finds Corporal Williams credible. He radioed his decision

to stop the Mazda because of the brake light to other officers, and Sergeant Deskins stated as much to the driver, even though he did not issue a citation for it. The law on this point is clear: where "a police officer observes a traffic violation, he is justified in stopping [a] vehicle." *Branch*, 537 F.3d at 337. Here, Corporal Williams observed a non-functional brake light on Defendant's Mazda. As a violation of West Virginia law, this objective basis legitimates Corporal Williams' decision to initiate a traffic stop. Therefore, even if the officers' suspicions about the occupants failed to meet a threshold of reasonable suspicion at this point in their investigation, the officers had a sufficient objective basis to stop the Mazda. As such, the stop was justified at its inception.

### B. Length of Traffic Stop

Next, the Court must consider whether the length and extent of the stop was longer than necessary given its purpose. *See Florida v. Royer*, 460 U.S. 491, 500 (1983). Although this is admittedly malleable language, "[t]he maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision." *Branch*, 537 F.3d at 336. The Court is guided, however, by the recognition that "[a]n officer may engage in certain safety measures during a traffic stop, but generally must focus his attention on the initial basis for the stop." *Hill*, 852 F.3d at 382. These safety measures can include checking for outstanding warrants and other ordinary inquiries, but officers must nevertheless diligently pursue the purpose of a traffic stop. *Id.* (citing *Palmer*, 820 F.3d at 649). As such, any unrelated investigative activity—such as a questioning about unrelated topics or a dog sniff—cannot prolong the duration of a stop. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (addressing unrelated questioning); *Illinois v. Caballes*, 543 U.S. 405, 407–09 (2005) (addressing dog sniffs).

Here, while the stated purpose of the stop was a defective center brake light, it seems plain that the officers' subjective focus from the very beginning was to investigate the possibility of

drug trafficking. Still, the correct test is not one of officers' intent; rather, the Court must look to "what the police in fact do," and to the reasonableness of their actions. *Hill*, 852 F.3d at 382 (internal quotations omitted). Yet even under an objective test, it would stretch the bounds of belief for the Court to conclude that the officers were focusing their "attention on the initial basis for the stop." *Id.* To begin, it appears the officers took only three actions related to traffic safety during the entire course of the stop: to announce their reason for pulling over the vehicle, to request identification from Cordle and the Robinsons, and to give Cordle a verbal warning to repair his brake light before allowing him to continue on from the scene of the Robinsons' arrest. Other ordinary aspects of a typical traffic stop are wholly absent from the officers' interactions with the Mazda's occupants. While Corporal Williams claims that Sergeant Deskins was checking Cordle's license for outstanding warrants during the dog sniff, Sergeant Deskins repeatedly testified that he never checked Cordle's license—at the scene or otherwise. *Id.* at 82. The officers prepared no written citation, either for a warning or fine. While Corporal Williams had checked the car's registration earlier in the morning, that check stemmed from suspicion over drug trafficking rather than any concern over a defective brake light. In short, the *only* actions taken in relation to the traffic violation before the very end of the stop were to inform the Mazda's driver why he had been pulled over and to request identification from the vehicle's occupants.

In contrast, almost all of the officers' time and energy was devoted to questioning and investigating the occupants about unrelated matters. While such questioning is permissible during the course of a traffic stop, it is impermissible if officers are no longer pursuing the purposes of the stop. *See Johnson*, 555 U.S. at 333; *Hill*, 852 F.3d at 382. The officers questioned the occupants in the car about their intended destination and their reasons for staying on the Greyhound until Huntington. Upon receiving answers they deemed unsatisfactory, the officers ordered the Mazda's

occupants to exit the vehicle and spaced them across the guardrail bordering the interstate. While Sergeant Deskins continued to question the occupants about matters unrelated to the traffic stop, Corporal Williams deployed Feera to perform a dog sniff of the vehicle. In short, far from focusing their attention on the initial basis for the stop—a defective center brake light—Sergeant Deskins and Corporal Williams focused almost exclusively on questioning the Mazda's occupants about unrelated matters and performing a dog sniff of their vehicle.

With these facts in mind, the Court concludes that the length and extent of the stop was longer than necessary in light of its purpose. As such, it was not reasonably related in scope to the purpose of the stop. *Branch*, 537 F.3d at 337. While the initial stop was legitimate, the officers' subsequent actions do not support a finding that the investigative portions of the traffic stop did not prolong its duration; indeed, it appears that the traffic stop would have ended after confirming the identification of each occupant if suspicions of drug trafficking had not been involved. Absent such a finding, the Court must consider whether the officers' possessed reasonable suspicion to extend the stop beyond that acceptable length.

### C. Reasonable Suspicion to Continue Traffic Stop

Having concluded that the length of the traffic stop exceeded the time in which "tasks tied to the traffic infraction . . . reasonably should have been . . . completed," *Rodriguez*, 135 S. Ct. at 1612, the Court must consider whether the Government has demonstrated that Corporal Williams and Sergeant Deskins possessed reasonable suspicion to extend the search past the end point of a routine traffic stop. As the occupants of the Mazda did not provide their consent to an extended investigatory stop, the only permissible justification for extending the stop is "reasonable suspicion that an illegal activity is occurring." *Bernard*, 927 F.3d at 805.

Here, the Government asserts that the officers quickly found reasonable suspicion to go beyond the traffic violation. The officers' suspicions began at the bus station, where they observed two males being picked up after arriving on the Detroit to Huntington bus. They advised Corporal Williams of their suspicions and provided him with the Mazda's license plate. He immediately learned the vehicle was registered to an Ashland, Kentucky address. At this point the officers decided to follow the Mazda, suspecting that it might be driving to Kentucky with its passengers despite the bus having stopped at the Ashland, Kentucky station immediately before arriving in Huntington. The officers considered this behavior characteristic of drug dealers who traveled by bus to stations they did not believe were under police supervision. Their suspicions were heightened when they observed the Mazda take the interstate on-ramp in the direction of Ashland, Kentucky, some sixteen miles to the east. Though at this point their suspicions were not sufficient to justify a stop of the Mazda, the car's broken brake light obviated the need to develop reasonable suspicion to initiate a traffic stop.

What subsequently transpired at the stop included simultaneous inquiries related to the brake light violation and the officers' suspicions of drug trafficking. By the time the Mazda was stopped, the officers had already run the plates confirming the Mazda was lawfully registered in Kentucky to an Ashland owner. Sergeant Deskins, upon initial contact with the driver, learned that he had maintained possession of Defendant's Michigan license from a previous visit. He also received "no good explanation" when he asked why the car was doubling back from Huntington to Kentucky. *Hr'g Tr.*, at 64. Importantly, all of this information was collected as the officers were collecting the occupants' licenses in the initial stages of the group's roadside detention.

At this point in the stop, then, the Government argues that several factors gave rise to an articulable reasonable suspicion that illegal activity was underway. First, officers had observed a

Kentucky license plate on the Mazda and subsequently confirmed its registration in Ashland. Second, Defendant's Michigan identification was still in the driver's possession from a previous trip. Third and crucially, the occupants were unable to provide any explanation as to why they were doubling back to Kentucky after riding the Greyhound through Ashland.

This is an uncommonly close case. The Court recognizes that "[t]he articulated factors supporting reasonable suspicion during a traffic stop must in their totality serve to eliminate a substantial portion of innocent travelers, and also demonstrate a connection to criminal activity." *Palmer*, 820 F.3d at 650. It is true that, on its own, any one of the factors listed above would likely apply to many innocent travelers. It is also true that "[r]easonable suspicion is something more than an inchoate and unparticularized suspicion or hunch," and the officers in the instant case tell a story that very nearly falls below this threshold. *Burton*, 228 F.3d at 527. Nonetheless, it bears repeating that "[t]he reasonable suspicion standard is less demanding than the probable cause standard or even the preponderance of evidence standard," *Bowman*, 884 F.3d at 213, and is based on the totality of the circumstances observed by police, *Palmer*, 820 F.3d at 652.

In view of these standards, the Court concludes that the totality of the circumstances afforded the officers reasonable suspicion to extend the stop past the length of a typical traffic stop. Sergeant Deskins observed two men exit a bus from Detroit and enter a vehicle licensed in Kentucky, despite the fact that their bus had just traveled through that state. A check of the vehicle's tag number revealed that it was registered to an owner in Ashland, where the bus had recently stopped. Upon reaching the interstate, the vehicle began traveling west toward Kentucky instead of east into West Virginia. When Sergeant Deskins requested Cordle's identification, he also produced Defendant's Michigan license—something he had maintained possession of from a previous trip. When asked, the vehicle's occupants provided no explanation as to why they were

doubling back to Kentucky. Taken together with Corporal Williams' and Sergeant Deskins' extensive experience in counter-trafficking operations, the Court is persuaded that the police possessed reasonable suspicion to prolong the duration of the stop.

It therefore follows that Sergeant Deskins and Corporal Williams acted within their authority when they ordered the occupants out of the vehicle to continue their questioning. To be clear, this reasonable suspicion would not justify an unlimited extension of the stop. The Court recognizes that where "an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). Had the Robinsons' subsequent answers been consistent, or had Feera not been at the scene already, the officers' reasonable suspicions stemming from their earlier conversations with the vehicle occupants would not have justified their continued detention. Here, however, the Robinsons' answers to the officers' inquiries continued to raise suspicions; both Defendant and his brother identified a different Huntington neighborhood as their cousin's place of residence, but were driving in the opposite direction toward Kentucky.[1] Insofar as these questions were asked as Corporal Williams was leading Feera around the vehicle, there was no associated delay with performing the actual dog sniff. The officers' decision to continue questioning the group and

---

[1] There is some dispute as to when this conversation actually occurred. Corporal Williams testified that he received contradictory answers from Defendant and his brother as to the vehicle's destination while he and Sergeant Deskins were requesting the group's licenses. *Hr'g Tr.*, at 44–45. Sergeant Deskins contradicted this testimony, recalling that he spoke to the Robinsons about their intended destination once the occupants had been ordered out of the vehicle. *Id.* at 67–68. Either way, the timing of the conversation does not affect the constitutional validity of the roadside detention. If the Court were to credit Corporal Williams' recollection, then the questioning took place during the commission of routine traffic safety checks—that is, reviewing the occupants' licenses—and it did not extend the duration of the stop. On the other hand, Sergeant Deskins' testimony places this conversation outside the vehicle and thus *after* the officers had developed a reasonable suspicion that criminal activity was underway.

deploy Feera was thus entirely permissible, grounded in a reasonable suspicion that criminal activity was underway.

## IV. CONCLUSION

For the foregoing reasons, Defendant's "Motion to Suppress All Evidence Obtained During Vehicle Stop and Search" (ECF No. 21) is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel and the defendant, the United States Attorney's Office, the United States Probation Office, and the United States Marshals Service.

ENTER: September 25, 2019

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE